ZIEGLER, ADMR., APPELLANT AND CROSS-APPELLEE, v. WENDEL POULTRY SERVICES, INC. ET AL., APPELLANTS AND CROSS-APPELLEES; WYNFORD LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, APPELLEE AND CROSS-APPELLANT.

[Cite as *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10.]

(No. 92–413—Submitted March 16, 1993—Decided May 26, 1993.)

*Kennedy, Purdy, Hoeffel & Gernert* and *Paul E. Hoeffel;  Chester, Hoffman, Willcox & Saxbe* and *Charles R. Saxbe,* for appellant and cross-appellee Bonnie K. Ziegler.

*Oxley, Malone, Fitzgerald & Hollister, Michael J. Malone* and *Julie A. Davenport,* for appellants and cross-appellees Wendel Poultry Services, Inc. and Terry E. Hummel.

*Shuler, Plank, Morgan & Brahm* and *Gordon P. Shuler; Spurlock, Sears, Pry & Griebling* and *Eric H. Griebling,* for appellee and cross-appellant.

---

KOEHLER, Acting C.J.  The parties have raised numerous propositions of law, which are set forth in their entirety in the appendix to this opinion.  We will consider the issues raised by subject matter.  We find that two of Ziegler's and Wendel's arguments have merit, and we therefore reverse the decision of the court of appeals.

I

### Assured Clear Distance

Wendel and Ziegler both contend that the appellate court erred in holding that Wynford was entitled to a directed verdict on the basis that Hummel was negligent *per se* because he violated R.C. 4511.21(A), the assured-clear-distance statute.  They argue that this conclusion by the appellate court, finding Hummel negligent as a matter of law, impermissibly invaded the province of the jury.  We agree.

R.C. 4511.21(A) provides that "no person shall drive any motor vehicle * * * at a greater speed than will permit him to bring it to a stop within the assured clear distance ahead."  "The assured-clear-distance statute is a specific requirement of law, the violation of which constitutes negligence *per se.*"  *Tomlinson v. Cincinnati* (1983), 4 Ohio St.3d 66, 69, 4 OBR 155, 157, 446 N.E.2d 454, 456.  However, a collision does not establish a violation of R.C. 4511.21(A) in every case.  *Id.* at 69, 4 OBR at 158, 446 N.E.2d at 457; *Blair v. Goff-Kirby Co.* (1976), 49 Ohio St.2d 5, 7, 3 O.O.3d 4, 5, 358 N.E.2d 634, 636.

" ' * * * Violation of the statute [R.C. 4511.21] and a finding of negligence *per se* depends [*sic* ] on whether there is evidence that the driver collided with an object which (1) was ahead of him in his path of travel, (2) was stationary or moving in the same direction as the driver, (3) did not suddenly appear in the driver's path, and (4) was reasonably discernible.  * * * ' " *Junge v. Brothers* (1985), 16 Ohio St.3d 1, 3, 16 OBR 254, 255, 475 N.E.2d 477, 479–480, quoting *Blair, supra,* 49 Ohio St.2d at 7, 3 O.O.3d at 5, 358 N.E.2d at 636.

Where conflicting evidence is presented as to any of the elements necessary to establish a violation of the statute, a jury question is created.  *Tomlinson, supra,* 4 Ohio St.3d at 69, 4 OBR at 158, 446 N.E.2d at 456.  "Especially in cases involving the assured-clear-distance statute, which, by definition, require evalua-

tion of the conduct of the driver in light of the facts surrounding the collision, the judgment of a jury is more likely to achieve a fair result than is a judge-made rule of law." *Blair, supra*, 49 Ohio St.2d at 9, 3 O.O.3d at 6, 358 N.E.2d at 637.

Construing the evidence most strongly in Ziegler's and Wendel's favor, we find that reasonable minds could reach different conclusions as to whether Hummel violated the assured-clear-distance statute and therefore a directed verdict is improper. See *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 412, 504 N.E.2d 19, 21; *Sabo v. Helsel* (1983), 4 Ohio St.3d 70, 72–73, 4 OBR 158, 161, 446 N.E.2d 457, 459–460. Evidence was presented from which the jury could reasonably conclude that Scott's bus suddenly appeared in Hummel's lane of travel within Hummel's assured clear distance ahead and rendered him unable, in the exercise of ordinary care, to avoid a collision. See *Erdman v. Mestrovich* (1951), 155 Ohio St. 85, 44 O.O. 97, 97 N.E.2d 674, paragraph two of the syllabus; *Smiley v. Arrow Spring Bed Co.* (1941), 138 Ohio St. 81, 20 O.O. 30, 33 N.E.2d 3, paragraph two of the syllabus. In effect, Scott testified at one point that she could see only twenty-three feet in the dense fog when she began her left turn onto Route 30, a heavily traveled truck route. She further testified that she assumed that all vehicles would be traveling at thirty-five m.p.h. in the extremely foggy conditions. She had achieved the speed of approximately twenty-two m.p.h. when she reached her lane of travel. Expert witnesses testified that Scott should not have pulled out onto Route 30 under these conditions and that it was impossible for Hummel to avoid the accident in the exercise of ordinary care.

Further, there was evidence from which the jury could reasonably conclude that the bus was not reasonably discernible in the heavy fog. See *Junge, supra*, 16 Ohio St.3d at 3–4, 16 OBR at 256, 475 N.E.2d at 480; *Tomlinson, supra*, 4 Ohio St.3d at 69, 4 OBR at 158, 446 N.E.2d at 456; *Blair, supra*, 49 Ohio St.2d at 9–10, 3 O.O.3d at 6, 358 N.E.2d at 637. Wynford relies upon *Woods v. Brown's Bakery* (1960), 171 Ohio St. 383, 14 O.O.2d 145, 171 N.E.2d 496, in which this court stated that "[t]he assured-clear-distance rule * * * applies to drivers of motor vehicles approaching an intersection on intersecting roads, in instances where such converging vehicles at the intersection are obscured by fog." *Id.* at paragraph one of the syllabus. However, in *Sabo, supra*, a case involving similar facts to those in the case at bar, we stated, "[i]t is important to note that the question of liability was submitted to the jury in *Woods*." *Id.*, 4 Ohio St.3d at 72, 4 OBR at 160, 446 N.E.2d at 459. We went on to discuss the preference for a jury determination of the facts and concluded that because conflicting evidence was presented, particularly regarding the density of the fog and the amount of visibility, a directed verdict was improper. *Id.* at 72–73, 4 OBR at 161, 446 N.E.2d at 459–460. We find *Sabo* to be controlling. In the present case, conflicting evidence was presented as to visibility in the fog, and we believe the

issue of whether the bus was reasonably discernible was properly submitted to the jury.

Accordingly, we sustain Ziegler's and Wendel's propositions of law on this issue, and we reverse the decision of the appellate court that a directed verdict should have been granted in favor of Wynford and that the jury should have been instructed that Hummel was negligent *per se.*[1]

## II
### Jury Interrogatories

The court of appeals held that the trial court erred when it refused to submit to the jury six of the twelve interrogatories prepared by Wynford, finding that the rejected interrogatories were "timely and properly submitted determinative questions." We have reviewed the rejected interrogatories. We find they do not address determinative issues and that at least some of them are ambiguous and confusing and therefore the trial court did not err in failing to submit them to the jury.[2]

Civ.R. 49(B) provides in pertinent part:

"The court shall submit written interrogatories to the jury, * * * upon request of any party prior to the commencement of argument. * * * The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues[,] whether issues of fact or mixed issues of fact and law."

In arguing that the trial court should have submitted the disputed interrogatories, Wynford relies upon *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 28 OBR 400, 504 N.E.2d 415. In that case, we stated that "[f]ollowing a timely request by a party, a mandatory duty arises to submit

---

1. We note that the trial court did instruct the jury that "if you find that the assured clear distance rule applies and was violated, then you must find the driver, Terry Hummel, was negligent." This instruction, together with the court's other instructions on assured clear distance, was proper and comported with the law as set forth in this decision.

2. The rejected interrogatories read as follows:
   "What was the minimum speed that defendant Terry E. Hummel traveled before he began breaking [*sic*] to avoid striking the Wynford school bus?
   "What was the minimum stopping distance for the Wendel Poultry tractor/trailer rig driven by Terry E. Hummel at the speed indicated in your answer to the previous Interrogatory?
   "At times relevant to the collision between the Wynford school bus and Wendel Poultry's tractor/trailer rig, what was the maximum distance of visibility for driver Terry E. Hummel?
   "What was the minimum distance from the front of the Wendel Poultry tractor/trailer rig driven by defendant Terry E. Hummel to the Wynford school bus driven by June M. Scott at the time the front of the Wynford school bus entered in to the eastbound lane of travel on U.S. 30?
   "When the front of the Wynford school bus entered the eastbound lane of U.S. 30, was the Wynford school bus beyond the vision of defendant Terry E. Hummel because of the fog?
   "Was the Wynford school bus a reasonably discernible object?"

written interrogatories to the jury, provided they are in the form the court approves." *Id.* at 336, 28 OBR at 402, 504 N.E.2d at 418. Nevertheless, Civ.R. 49(B) does not require the trial judge to act as a " ' "mere conduit who must submit all interrogatories counsel may propose." ' " *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 107, 592 N.E.2d 828, 836, quoting *Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161, 165, 71 O.O.2d 164, 166, 327 N.E.2d 645, 649. The court retains limited discretion to reject proposed interrogatories where they are ambiguous, confusing, redundant, or otherwise legally objectionable. Proper jury interrogatories must address determinative issues and must be based upon the evidence presented. *Ramage, supra,* at paragraph three of the syllabus. Civ.R. 49(B) does not require submission of an interrogatory which is " 'merely of a probative or evidentiary nature.' " *Ragone, supra,* 42 Ohio St.2d at 169, 71 O.O.2d at 168, 327 N.E.2d at 651.

In *Miller v. McAllister* (1959), 169 Ohio St. 487, 494, 8 O.O.2d 485, 490, 160 N.E.2d 231, 237, we defined "determinative issues" as "ultimate issues which when decided will definitely settle the entire controversy between or among the parties, so as to leave nothing for the court to do but to enter judgment for the party or parties in whose favor such determinative issues have been resolved by the jury." Similarly, the 1970 Staff Note to Civ.R. 49 cites a definition of "determinative" as "an issue the deciding of which by the jury may in and of itself dispose of the entire case."

In the present case, the trial court submitted Wynford's first six proposed interrogatories to the jury. These interrogatories dealt with determinative issues such as which parties were negligent, what percentage of the negligence was attributable to those parties, and the amount of damages. See *Ragone, supra,* at paragraph two of the syllabus. The remaining interrogatories, which were rejected by the trial court, would have required the jury to state specific measurements of distance, visibility and speed, matters which are evidentiary, not determinative. Wynford, in effect, was seeking to have the jury "itemize" its verdict. See *Vaughn v. Natl. RR. Passenger Corp.* (Sept. 13, 1990), Cuyahoga App. No. 57315, unreported, at 9, 1990 WL 130917. Additionally, the trial court found, and Wynford's counsel acknowledged, that some of the interrogatories were badly worded and confusing. Under the circumstances, we cannot say that the trial court abused its discretion in refusing to submit the proposed interrogatories, and we reverse the decision of the appellate court in that respect.

### III

### "High-low" Agreement

On the first day of trial, counsel for Ziegler and Wendel informed the trial court that they had reached a settlement. Under the terms of the unwritten

agreement, which was read into the record prior to voir dire of the jurors, in exchange for a covenant not to execute on judgment, Wendel's insurance company guaranteed the Ziegler estate payment of $325,000 regardless of the jury verdict and payment of up to $450,000 if the jury determined that Wendel was liable to that extent. Over Wynford's objection, the trial court approved the so-called "high-low" agreement and held that it would not be disclosed to the jury.

Wynford contends this agreement constituted a Mary Carter agreement. See *Booth v. Mary Carter Paint Co.* (Fla.App.1967), 202 So.2d 8. It urges this court to declare Mary Carter agreements void as against public policy as some states have done, see *Elbaor v. Smith* (Tex.1992), 845 S.W.2d 240; *Cox v. Kelsey–Hayes Co.* (Okla.1978), 594 P.2d 354; *Lum v. Stinnett* (1971), 87 Nev. 402, 488 P.2d 347, and to hold that Wendel should not have participated in the trial. In the alternative, Wynford asks us to hold that the Mary Carter agreement must be disclosed to the jury. See *Daniel v. Penrod Drilling Co.* (E.D.La.1975), 393 F.Supp. 1056; *Corn Exchange Bank v. Tri–State Livestock Auction Co.* (S.D. 1985), 368 N.W.2d 596; *Ward v. Ochoa* (Fla.1973), 284 So.2d 385; *Gen. Motors Corp. v. Lahocki* (1980), 286 Md. 714, 410 A.2d 1039. The court of appeals concluded that the high-low agreement in the present case is not a Mary Carter agreement as that term has been defined in Ohio and that the trial court did not err in allowing Wendel to participate in the trial or by failing to disclose the agreement to the jury. We agree.

In *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 93, 566 N.E.2d 154, 156, this court defined a "Mary Carter agreement" as "a contract between a plaintiff and one defendant allying them against another defendant at trial." We further stated:

" 'Mary Carter agreements may incorporate any variety of terms, but are generally characterized by three basic provisions. First, the settling defendant guarantees the plaintiff a minimum payment, regardless of the court's judgment. Second, the plaintiff agrees not to enforce the court's judgment against the settling defendant. Third, the settling defendant remains a party in the trial, but his exposure is reduced in proportion to any increase in the liability of his codefendants over an agreed amount. Some Mary Carter agreements include a fourth element: that the agreement be kept secret between the settling parties.' " *Id.* at 93, 566 N.E.2d at 157, fn. 1, quoting Note, It's a Mistake to Tolerate the Mary Carter Agreement (1987), 87 Colum.L.Rev. 368, 369–370.

We conclude that the agreement in the present case is not a "Mary Carter agreement" as that term is defined in *Vogel.* Wendel's exposure to liability was not reduced in proportion to any increase in liability of Wynford over an agreed amount. The amount of damages assessed against Wynford had no impact on the amount Wendel would pay to Ziegler. There was no built-in incentive on

Wendel's part to increase Ziegler's damages. See *Soria v. Sierra Pacific Airlines, Inc.* (1986), 111 Idaho 594,. 604–605, 726 P.2d 706, 716–717.

One of the major dangers of Mary Carter agreements lies in the distortion of the relationship between the settling defendant and the plaintiff, which allows the settling defendant to remain nominally a defendant to the action while secretly conspiring to aid the plaintiff's case. See *Jones v. Ruhlin Co.* (Oct. 24, 1990), Summit App. No. 14568, unreported, at 8, 1990 WL 163864, citing *Vermont Union School Dist. No. 21 v. H.P. Cummings Constr. Co.* (1983), 143 Vt. 416, 469 A.2d 742; *Elbaor, supra,* 845 S.W.2d 240; *Ward, supra,* 284 So.2d 385. That concern is not present here. Wendel still had an incentive to keep the amount of damages down, since a higher verdict could result in Wendel paying up to $125,000 more should the jury's verdict have been over $325,000. As stated by the court of appeals, "[t]he fact that Wendel Poultry remained at risk of·liability in a significant amount is indicative of a lack of collusive purpose in executing the agreement." Further, our review of the record does not support Wynford's allegation that Wendel was allied with Ziegler, but instead shows that their positions remained adversarial and that Wendel presented its case with vigor.

Accordingly, the trial court did not err by approving the agreement or by allowing Wendel to participate in the trial. Likewise, the trial court did not err in refusing to disclose the agreement to the jury. See Evid.R. 408. The law favors prevention of litigation by compromise and settlement. "So long as there is no evidence of collusion, in bad faith, to the detriment of other, non-settling parties, the settlement of litigation will be encouraged and upheld." *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 69–70, 567 N.E.2d 1291, 1307.

Despite its conclusion that the high-low agreement was valid, the appellate court also concluded that the trial court erred in overruling Wynford's motion to set off the $325,000 Wendel paid to Ziegler pursuant to the agreement against the verdict under the Ohio Contribution Among Joint Tortfeasors Act. We agree. R.C. 2307.32(F) provides:

"When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or loss to person or property or the same wrongful death, the following apply:

"(1) The release or covenant does not discharge any of the other tortfeasors from liability for the injury, loss, or wrongful death unless its terms otherwise provide, but it reduces the claim against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater[.]"

Ziegler argues that this statute does not apply, because Wendel and Hummel were not found to be liable by the jury and therefore they are not joint tortfeasors, an argument we view as an overly technical interpretation of the

statute. Courts have concluded that there does not have to be a judicial determination of liability for a settling defendant to be considered a tortfeasor within the meaning of contribution statutes. See Annotation (Supp.1989 and 1992), 34 A.L.R.2d 1107.

This case presents a somewhat unusual situation. Usually the settling defendant will not participate in the trial and there would be no jury determination of that defendant's liability. Even though in this case Wendel did participate in the trial, we think the setoff provision is still applicable. The settlement agreement between Wendel and Ziegler was clearly executed in contemplation of Wendel's being found jointly and severally liable for Michael Ziegler's death. See R.C. 2307.31(A). We believe that the situation at the time of the settlement should be controlling. To hold otherwise would be to permit the plaintiff to obtain a double recovery, something the statute was clearly designed to prevent. The jury determined that Ziegler was entitled to total damages of $1,607,735; she is not entitled to recovery above that amount. We conclude, therefore, that the appellate court's decision that the $325,000 payment from Wendel to Ziegler should be set off against the total verdict is proper.

## IV

### Prejudgment Interest

The trial judge assessed prejudgment interest against Wynford because it failed to make a good faith effort to settle the case pursuant to R.C. 1343.03(C). The court of appeals affirmed. Wynford now argues that that award is neither legally nor factually justified. First, it claims that prejudgment interest may not be awarded against a political subdivision of the state absent a special statute authorizing the award.

The school board relies upon *Beifuss v. Westerville Bd. of Edn.* (1988), 37 Ohio St.3d 187, 525 N.E.2d 20, which states in the syllabus that "[a] public school board of education is not liable for the payment of prejudgment interest on an award of back pay absent a statute requiring such payment or an express contractual agreement to make such payment." The appellate court concluded that *Beifuss* was inapplicable because it was a narrow holding which referred only to contractual wage disputes. The appellate court's assessment is correct.

*Beifuss* is distinguishable. *Beifuss* involved a contractual action for back pay by a group of teachers who appealed the court of appeals' decision vacating the trial court's decision awarding them prejudgment interest. The teachers relied upon a previous decision by this court in which we held that the defense of sovereign immunity is not available to a board of education in an action seeking damages for injuries allegedly caused by the negligence of the board's employees.

We distinguished that case on the basis that *Beifuss* involved a contractual action, not a tort action. We stated:

"Judicial intrusion into the matters of contracting parties is an extreme measure which should occur sparingly, if at all. We find that such an expansion of a public school board's contractual liability should be created through clearly expressed legislation by the General Assembly or by the parties themselves at the bargaining table." (Footnote omitted.) *Id.* at 190, 525 N.E.2d at 23.

After *Beifuss*, we decided *State ex rel. Tavenner v. Indian Lake Local School Dist. Bd. of Edn.* (1991), 62 Ohio St.3d 88, 578 N.E.2d 464, in which we held that postjudgment interest could be assessed against a school board pursuant to R.C. 1343.03(A). We stated:

"According to R.C. 3313.17, a board of education is ' * * * a body politic and corporate, and, as such, capable of suing and being sued * * *.' In *State ex rel. Springfield City School Dist. Bd. of Edn. v. Gibson* (1935), 130 Ohio St. 318, 4 O.O. 352, 199 N.E. 185, paragraph two of the syllabus, we stated:

" 'A board of education or school district, clothed with the capacity to sue and be sued, is thereby rendered amenable to the laws governing litigants * * *.'

"In *Gibson* at 322, 4 O.O. at 354, 199 N.E. at 187, we explained that a school board was not the complete sovereign that the state was. We added:

" 'Where a board of education or school district is subject to suit, it is to be treated, for the purpose of such suit, in the same manner as a private litigant. Not being an entire sovereignty, there is no sound reason for treating it in a manner different from the manner of treating any other litigant. The law should be of universal application and without distinction among litigants. The fact that a board of education or school district is engaged in a public task is an immaterial circumstance. When it is rendered subject to suit without consent, it is automatically stripped of its attribute of sovereignty and of the exemptions and immunities available to sovereignties.' " *Id.*, 62 Ohio St.3d at 90, 578 N.E.2d at 465–466.

The same logic applies in the present case. If school boards should be treated like other litigants and can have postjudgment interest assessed against them pursuant to R.C. 1343.03(A), then they should be subject to prejudgment interest under R.C. 1343.03(C), if they do not make a good faith effort to settle. Accordingly, we conclude that prejudgment interest may be assessed against a school board.

Wynford further argues that the evidence does not support the trial court's conclusion that it failed to make a good faith effort to settle. It claims that it had a good faith, objectively reasonable belief that it had no liability and therefore was not obligated to make a settlement offer.

R.C. 1343.03(C) provides:

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

In *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, syllabus, we held:

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer."

The decision whether a party's settlement efforts indicate good faith is within the discretion of the trial court. This court will not disturb the trial court's findings absent an abuse of discretion. *Id.* at 159, 25 OBR at 203, 495 N.E.2d at 574.

The evidence shows that Wynford's insurance company, Personal Service Insurance Corporation ("PSI"), consistently maintained it had no liability at all, based on Hummel's alleged violation of the assured-clear-distance statute. Even though Wynford's policy limits were $250,000, PSI had reserves of only $30,000, which its representatives acknowledged were to cover litigation expenses. The rest of the funds were in the hands of its reinsurer, whom PSI did not involve until after the jury verdict. Five days before trial, PSI offered $25,000 and told Ziegler's counsel he should take the offer because PSI planned an appeal to the court of appeals and to the Supreme Court and it would be a long time before Ziegler received any money. After trial began, and Ziegler and Wendel had reached an agreement, PSI offered to pay $100,000 and would not go over that amount, despite a request by Wynford's counsel to settle for policy limits.

The trial court concluded that PSI did not have an objectively reasonable belief that it had no liability at all, based upon the undisputed fact that Scott pulled out onto a heavily traveled highway in the fog with little or no visibility. The trial court also concluded that Ziegler bargained in good faith despite her failure to supply a "settlement package" (that is, a report of plaintiff's attorney's investigations and analysis supporting his settlement demand), and that PSI did not respond in good faith to Ziegler's settlement offers, forcing plaintiff to "bid

against [herself]." These findings of facts are supported by competent, credible evidence. Accordingly, we cannot find that the trial court's decision to award prejudgment interest is so arbitrary, unreasonable, or unconscionable as to connote an abuse of discretion. See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

V

Decedent's Insurer's Subrogation Claim

Prior to trial, the parties stipulated that Michael Ziegler was insured by Grange Mutual Casualty Company, which had paid $10,336.60 for damage to his pickup and other expenses. The written stipulation provided that Grange had "become subrogated to the rights of Michael Scott Ziegler's Estate to recover from those who may be found to have been liable for such damages" and that in the event of a verdict for the estate, "such monies shall be paid to Grange Mutual Casualty Company." Grange was never made a party to the lawsuit. After trial, the trial court entered judgment in favor of Grange and against Wynford in the amount of $10,336.60. The court overruled Wynford's motion to vacate that judgment, stating that the entry was the result of a stipulation and "this court refuses to allow a party to back out of an agreement or stipulation."

The court of appeals reversed, concluding that the trial court had misinterpreted the stipulation. It concluded that the $10,336.60 received by the Ziegler estate from Grange should have been set off against the verdict against Wynford pursuant to R.C. 2744.05(B). We agree.

R.C. 2744.05(B) provides:

"If a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by the claimant. No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to such benefits. Nothing in this division shall be construed to limit the rights of a beneficiary under a life insurance policy or the rights of sureties under fidelity or surety bonds."

In *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 550 N.E.2d 181, we concluded that R.C. 2744.05(B) is constitutional.

Under this statute, Grange cannot bring a subrogation action against Wynford and any amounts paid by Grange to Ziegler must be set off against the total jury award. Ziegler argues that *Menefee* should not be applied retroactively because it was decided after the stipulation and therefore it is not controlling. Ziegler

apparently misunderstands *Menefee's* holding. In that case, we held that R.C. 2744.05(B) did not violate the Equal Protection Clauses of the United States or the Ohio Constitutions. The statute itself was in effect at the time the cause of action arose, and governs this action.

Ziegler also argues that the parties stipulated that Grange would receive the $10,366.60 from the party found to be liable and Wynford should not be permitted to back out of the agreement. However, it is not entirely clear from the record that that was indeed the agreement. The written stipulation is ambiguous, and there was some argument back and forth on the issue at trial. Once the issue was brought up to the trial court, Ziegler's counsel stated, "I just wanted to make sure that I don't have to prove the value, that that is all proven value on the pickup." Apparently, the purpose of the stipulation was to take the issue of the value of the pickup truck away from the jury. There did not appear to be an agreement as to how Grange would be reimbursed for the money it had already paid to Ziegler's estate. In the absence of a clear agreement, we decline to circumvent R.C. 2744.05(B). We conclude, therefore, that the appellate court was correct in holding that money paid by Grange should be set off against the total verdict awarded to Ziegler.

## VI

### Page Limitations

Finally, Wynford argues that it was denied due process of law when the court of appeals limited Wynford's brief to a total of forty pages, instead of the seventy-five Wynford requested. Wynford claims that it did not have the opportunity to fairly present all of its arguments under the twelve assignments of error it raised. We find no merit in this argument.

Courts have inherent power to supervise the proceedings before them to ensure the orderly and efficient exercise of jurisdiction. *State ex rel. Dow Chem. Co. v. Court of Common Pleas of Cuyahoga Cty.* (1982), 2 Ohio St.3d 119, 121, 2 OBR 668, 669, 443 N.E.2d 143, 144, quoting *Hale v. State* (1896), 55 Ohio St. 210, 213, 45 N.E. 199, 200; *State ex rel. Butler v. Demis* (1981), 66 Ohio St.2d 123, 128–129, 20 O.O.3d 121, 124, 420 N.E.2d 116, 120. Page limitations are a valid exercise of that power. Even in capital cases, we have upheld page limitations, finding that they force counsel to winnow out weaker arguments and focus on key issues. *State v. Davis* (1991), 62 Ohio St.3d 326, 352, 581 N.E.2d 1362, 1382, certiorari dismissed (1992), 506 U.S. ——, 113 S.Ct. 302, 121 L.Ed.2d 6; *State v. Bonnell* (1991), 61 Ohio St.3d 179, 186, 573 N.E.2d 1082, 1088, certiorari denied (1992), 503 U.S. ——, 112 S.Ct. 1205, 117 L.Ed.2d 444. "Succinctness of argument is a beneficial trait in the art of appellate advocacy." *Id.*

The court of appeals gave Wynford an extra fifteen pages over its normal page limit of twenty-five pages in which to make its arguments. See Loc.R. 7(B) of the Third District Court of Appeals. A limit of forty pages was reasonable and afforded Wynford ample opportunity to concisely present all of its arguments. The fact that the appellate court required Wynford to be succinct does not amount to a denial of due process. *Davis, supra*, 62 Ohio St.3d at 352, 581 N.E.2d at 1382.

## VII

### Summary

The judgment of the court of appeals is affirmed in part and reversed in part. The jury verdict against Wynford in favor of Ziegler is reinstated, but shall be reduced by the appropriate setoffs for the $325,000 paid by Wendel and the $10,336.60 paid by Grange. The award of prejudgment interest is affirmed.

*Judgment affirmed in part
and reversed in part.*

HILDEBRANDT, BOWMAN, NAHRA, SHERCK, O'NEILL and GLASSER, JJ., concur.

RICHARD N. KOEHLER, J., of the Twelfth Appellate District, sitting for MOYER, C.J.

LEE H. HILDEBRANDT, JR., J., of the First Appellate District, sitting for A.W. SWEENEY, J.

DONNA BOWMAN, J., of the Tenth Appellate District, sitting for DOUGLAS, J.

JOSEPH J. NAHRA, J., of the Eighth Appellate District, sitting for WRIGHT, J.

JAMES R. SHERCK, J., of the Sixth Appellate District, sitting for RESNICK, J.

JOSEPH E. O'NEILL, J., of the Seventh Appellate District, sitting for F.E. SWEENEY, J.

GEORGE M. GLASSER, J., of the Sixth Appellate District, sitting for PFEIFER, J.

### APPENDIX

Wendel and Hummel's Propositions of Law:

Proposition of Law No. 1

"Negligence *per se* does not equate to liability *per se*. Accordingly, an appellate court errs when it reverses a jury's determination that the negligence of one of two defendants was the sole proximate cause of a collision on the grounds the non-liable defendant was negligent *per se* in violating the assured clear distance ahead statute."

24

Proposition of Law No. 2

"A properly posed jury interrogatory under Civ.R. 49(B) is one which necessitates a finding of a particular question of fact which is of a determinative nature as opposed to inviting a response of a mere probative or evidentiary quality designed to disclose the mental processes by which a jury arrives at conclusions of fact.    * * * "

Ziegler's Propositions of Law:

Proposition of Law No. 1

"A violation of R.C. 4511.21(A) is not negligence *per se* and a court errs in directing a verdict against a party in a comparative negligence case on such a basis."

Proposition of Law No. 2

"R.C. 2307.32(F)(1) is inapplicable to monies paid by a party who is not adjudged a tortfeasor."

Proposition of Law No. 3

"A stipulation entered into by the parties to a lawsuit remains binding regardless of a change in the law."

Wynford's Propositions of Law in its Cross–Appeal:

Proposition of Law No. 1

"In an action against two defendants, where one defendant enters into a 'Mary Carter' agreement with the plaintiff whereby the agreeing defendant remains a party to the action and ostensibly defends himself in the trial even though his liability is limited by the agreement, the agreement is kept secret from the jury, and the agreeing defendant guarantees that the plaintiff will recover a certain amount regardless of the outcome of the trial, the trial court must either refuse to approve the agreement and refuse to permit the agreeing defendant to participate in the trial, or must permit the remaining defendant to make the agreement and its terms known to the jury."

Proposition of Law No. 2

"Prejudgment interest may not be awarded against a political subdivision of the state absent a special statute authorizing such an award, and R.C. 1343.03(C), a general statute, does not authorize such an award."

Proposition of Law No. 3

"When a party has fully cooperated in discovery proceedings, rationally evaluated its risk and potential liability, not attempted to unnecessarily delay the proceedings, and, based upon a good faith, onjectively [*sic* ] reasonable belief that it had no liability, made an offer to settle based upon the cost of defense, and, at the first opportunity when information became known to that party tending to

rebut its belief that it had no liability, made a good faith monetary settlement offer, it is an abuse of discretion for the trial court to award prejudgment interest against that party under R.C. 1343.03(C)."

Proposition of Law No. 4

"In a case wherein the trial consumed 24 calendar days producing a transcript of 2,586 pages and post-verdict hearings consumed another 2 days producing a transcript of 357 pages, and wherein 12 legitimate assignments of error are presented on appeal, the appellant is denied due process of law and proper redress in the courts of this state when the court of appeals limits the appellant to a total of 40 pages within which to present the arguments on its assignments of error."