HODESH, APPELLANT, *v*. KORELITZ ET AL., APPELLEES, ET AL.

[Cite as *Hodesh v. Korelitz*, 123 Ohio St.3d 72, 2009-Ohio-4220.]

*A Mary Carter agreement must be disclosed to a jury — Agreement in this case was not a Mary Carter agreement, and the trial court did not abuse its discretion in not disclosing it to the jury.*

(No. 2008-1133 — Submitted April 7, 2009 — Decided August 27, 2009.)

APPEAL from the Court of Appeals for Hamilton County,

Nos. C-061013, C-061040, C-070168, and C-070172, 2008-Ohio-2052.

_____

PFEIFER, J.

{¶ 1} The sole legal issue in this case is whether an agreement between appellant, Michael Hodesh, and one of the defendants in Hodesh's medical-malpractice action, Jewish Hospital of Cincinnati, should have been disclosed to the jury. For the reasons that follow, we conclude that the trial court did not abuse its discretion by not requiring disclosure of the agreement.

**Facts and Procedural History**

{¶ 2} Michael Hodesh filed a medical-malpractice action against appellee Dr. Joel Korelitz and the Jewish Hospital of Cincinnati, among others, alleging that Korelitz and the hospital staff had left a towel in his abdomen following a surgery for diverticulitis. Two and a half weeks before the trial, Hodesh and the hospital entered into a "Contingency Agreement," which contained, among other provisions, a series of provisions that collectively limited the hospital's exposure to $250,000 and ensured that Hodesh would receive at least $175,000.

{¶ 3} On the first day of trial, Korelitz requested disclosure of any agreements between Hodesh and the hospital. The court ordered Hodesh to

submit to the court any existing agreements between him and the hospital. Hodesh submitted the agreement, which the judge did not read before placing it under seal. The judge stated that there was no evidence of collusion and, based on Hodesh's declaration that the agreement was a high/low agreement, concluded that the agreement did not need to be disclosed to the jury. The jury found Korelitz negligent and returned a verdict in favor of Hodesh, awarding him $775,000. The jury also found that the hospital was not liable. After the verdict, the court provided a copy of the agreement to Korelitz.

**{¶ 4}** Korelitz appealed on several grounds. The only issue he raised that is relevant to this case is whether the trial court erred by not compelling disclosure of the agreement. The court of appeals held that the trial court committed reversible error by not disclosing the agreement to the jury. We accepted Hodesh's discretionary appeal.

### Settlement Agreements

**{¶ 5}** Settlement agreements are valid when "there is no evidence of collusion, in bad faith, to the detriment of other, non-settling parties." *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 69-70, 567 N.E.2d 1291. Although settlement agreements are as varied as the cases in which they are used, they fall into general categories. In a typical settlement agreement, "a settling defendant is withdrawn from the case and released from liability." *Monti v. Wenkert* (2008), 287 Conn. 101, 122, 947 A.2d 261. In a typical "high-low settlement agreement * * *, the settling defendant remain[s] in the case and the extent of her liability [is] predicated on the amount of the verdict." Id. There is another species of settlement agreement, called a Mary Carter agreement, see *Booth v. Mary Carter Paint Co.* (Fla.App.1967), 202 So.2d 8, which we have defined as "a contract between a plaintiff and one defendant allying them against another defendant at trial." *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 93, 566 N.E.2d 154. See *Saleeby v. Rocky Elson Constr., Inc.* (Fla.2009), 3 So.3d 1078,

1083, fn. 3 (a Mary Carter agreement is "a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants"). The court of appeals in this case determined that the agreement between Hodesh and the hospital was a Mary Carter agreement, and that determination is why it held that the agreement should have been disclosed.

{¶ 6} Mary Carter agreements are per se invalid in some states. See, e.g., *Dosdourian v. Carsten* (Fla.1993), 624 So.2d 241, 246; *Cox v. Kelsey-Hayes Co.* (1978), 1978 OK 148, 594 P.2d 354, 360; *Elbaor v. Smith* (Tex.1992), 845 S.W.2d 240, 250. We mentioned this minority view in *Ziegler v. Wendel Poultry Servs., Inc.* (1993), 67 Ohio St.3d 10, 16, 615 N.E.2d 1022, overruled on other grounds by *Fidelholtz v. Peller* (1998), 81 Ohio St.3d 197, 690 N.E.2d 502. We did not adopt the minority position then, nor do we now. Instead, we are persuaded that the majority approach, which requires Mary Carter agreements to be disclosed to codefendants and the jury, is more reasonable and compatible with Ohio's approach to settlement agreements. *Monti*, 287 Conn. at 124, 947 A.2d 261. See *Soria v. Sierra Pacific Airlines, Inc.* (1986), 111 Idaho 594, 604, 726 P.2d 706 (disclosure exposes a settling defendant's incentive to increase plaintiff's damages).

{¶ 7} We have considered agreements alleged to be Mary Carter agreements on two separate occasions; both times we determined that the agreement was valid and did not need to be disclosed to the jury. *Vogel*, 57 Ohio St.3d at 93-94, 566 N.E.2d 154; *Ziegler*, 67 Ohio St.3d at 17, 615 N.E.2d 1022. In *Vogel*, a defendant/appellant alleged that another defendant and the plaintiff had entered into a collusive agreement akin to a Mary Carter agreement and that the trial court had erred in refusing to disclose the existence of the agreement to the jury. *Vogel*, 57 Ohio St.3d at 93-94, 566 N.E.2d 154. We noted that Mary

Carter agreements typically have three basic provisions: a guarantee of a minimum payment to the plaintiff, an agreement that the plaintiff will not enforce a court judgment against the settling defendant, and an agreement that the settling defendant will remain a party in the trial but his monetary exposure is reduced in proportion to an increase in the liability of nonsettling codefendants. Id. at 93, fn. 1. We concluded that the agreement at issue was not collusive, after examining the trial court's decision under an abuse-of-discretion standard. Id. at 94.

{¶ 8} In *Ziegler*, we concluded that the agreement between the plaintiff and one of the defendants was not a Mary Carter agreement, primarily because "[t]he amount of damages assessed against [the nonsettling defendant] had no impact on the amount [the settling defendant] would pay to [the plaintiff]. There was no built-in incentive on [the settling defendant's] part to increase [the plaintiff's] damages." *Ziegler*, 67 Ohio St.3d at 16-17, 615 N.E.2d 1022. We also stated that "[o]ne of the major dangers of Mary Carter agreements lies in the distortion of the relationship between the settling defendant and the plaintiff, which allows the settling defendant to remain nominally a defendant to the action while secretly conspiring to aid the plaintiff's case." Id. at 17. See *Vermont Union School Dist. No. 21 v. H.P. Cummings Constr. Co.* (1983), 143 Vt. 416, 427, 469 A.2d 742.

{¶ 9} Although the advent of complex contingent agreements has complicated the matter, we remain committed to facilitating the settlement of legal controversies, even contingent agreements that do not preclude the necessity of a trial. *Krischbaum*, 58 Ohio St.3d at 69-70, 567 N.E.2d 1291. All settlement agreements in Ohio must be free from collusion, regardless of whether they fall under the category of Mary Carter agreements. When reviewing a settlement agreement to determine whether it is collusive, we are guided by the typical Mary Carter agreement provisions; specifically, we look for a provision that decreases the settling defendant's liability in proportion to an increase in the nonsettling

defendant's liability. *Vogel*, 57 Ohio St.3d at 93, 566 N.E.2d 154, fn. 1 (setting forth the basic Mary Carter agreement provisions). See *Hoops v. Watermelon City Trucking Inc.* (C.A.10, 1988), 846 F.2d 637, 640. We are concerned that such an arrangement provides an inducement for the settling defendant to "secretly conspir[e] to aid the plaintiff's case." *Ziegler*, 67 Ohio St.3d at 17, 615 N.E.2d 1022. This collusive purpose is obviated when the settling defendant " 'remain[s] at risk of liability in a significant amount.' " Id., quoting the court of appeals opinion (Dec. 31, 1991), 3d Dist. Nos. 3-90-31 and 3-90-44, 1991 WL 280029.

### The Agreement between Hodesh and the Hospital

{¶ 10} As a preliminary matter, we note that "[i]n construing the terms of any contract, the principal objective is to determine the intention of the parties." *Hamilton Ins. Servs, Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 273, 714 N.E.2d 898.

{¶ 11} The agreement between Hodesh and the hospital contains 16 numbered paragraphs. When read in pari materia, they evince an intention to ensure that Hodesh receives at least $175,000 and that the hospital's liability be capped at $250,000. This is apparent from paragraph 7 of the agreement, which states, "In any contingency that has not been addressed specifically by this Agreement, [the hospital] guarantees [Hodesh] a total payment of at least $175,000.00 with a cap of $250,000.00. In no event, will [the hospital] be required to pay Hodesh more than $250,000.00." The most problematic contingency for Hodesh is paragraph 3, which includes, among other things, this provision: "In the event there is a verdict against Korelitz and not [the hospital] for more than $250,000.00, Hodesh will not look to [the hospital] for any payment and will recover all from Korelitz."

{¶ 12} This provision appears to provide an incentive for the hospital to increase the damages against Korelitz. See *Ziegler*, 67 Ohio St.3d at 16-17, 615

N.E.2d 1022. But three factors prevent us from reaching that conclusion. First, there are several contingency clauses under which the hospital will pay less if the damages are less. The lower the verdict, the greater the likelihood that the hospital would be required to pay $175,000 and the less the likelihood that it would be required to pay $250,000. Thus, the hospital had a financial interest in a lower verdict. See *Ziegler* at 17.

{¶ 13} Second, paragraph 3 requires the hospital to pay $175,000, even if the verdict against Korelitz exceeded $250,000, if Korelitz or his insurance company does not pay within 30 days. An appeal by Korelitz would delay payment past 30 days, triggering this provision, and the higher the verdict, the more likely it would be that Korelitz would appeal.

{¶ 14} Third, the trial judge saw no signs of collusion during the trial. Even though the judge had not read the agreement, he knew that Hodesh and the hospital had an agreement and that Korelitz was concerned that the agreement was collusive. Thus, he was on alert for any trial tactics that appeared collusive.

{¶ 15} A better course of action would have been for the judge to read the agreement prior to sealing it. But after the trial, when the document was disclosed to Korelitz and he moved for a new trial, the judge determined that the agreement was not collusive and denied the motion. After reading the agreement and reviewing the record, we also are convinced that the parties to the agreement were not in collusion.

{¶ 16} The court of appeals read much into the hospital's decision to oppose bifurcation of the trial, which would have separated the issue of negligence from the issue of intentional destruction of evidence, and the hospital's decision to excuse a juror who was potentially sympathetic to the defendants. Although it is always possible to second-guess trial tactics, the trial court was in a better position than the court of appeals to determine the motives of counsel and whether collusion was behind their decisions, because he observed counsel and

witnesses while the court of appeals reviewed a cold record. In denying Hodesh's posttrial motions to revoke the agreement and to grant a new trial, the trial court wrote, "[T]here was no evidence that [the hospital] remained as only a nominal Defendant which conspired with [Hodesh] to the detriment of Dr. Korelitz. The positions of [Hodesh] and the hospital remained adversarial at all times."

### Other Considerations

{¶ 17} A fact that must be considered whenever one defendant makes an allegation of collusion between his codefendant and the plaintiff is that codefendants often attempt to blame each other. Part of the defense for both the hospital and Korelitz in this case is that the other defendant was to blame for the towel having been left in Hodesh's abdomen. That the hospital attempted to show that Korelitz was responsible was no more evidence of collusion than Korelitz's attempt to convince the jury that the hospital staff was to blame. The legal positions of codefendants are often antithetical and adversarial. Plaintiffs benefit when codefendants attempt to blame each other; that, standing alone, is not evidence of collusion.

### Conclusion

{¶ 18} For all the reasons above, we conclude that the agreement between Hodesh and the hospital was not collusive and that the trial court did not abuse its discretion in refusing to disclose the agreement to the jury. We reverse the judgment of the court of appeals on this issue. Several issues that were raised in the court of appeals were mooted by that court when it determined that the agreement should have been disclosed. Those issues now need to be addressed. Accordingly, we remand the cause to the court of appeals with instructions to consider those issues.

Judgment reversed
and cause remanded.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

————————————

Bruce Whitman, for appellant.

Tucker, Ellis & West, L.L.P., and Irene C. Keyse-Walker; and Triona, Calderhead & Lockemeyer and David Calderhead, for appellees Joel Korelitz, M.D., and Cincinnati General Surgeons, Inc.

Paul W. Flowers Co., L.P.A., and Paul W. Flowers; and Elk & Elk Co., Ltd., and Peter D. Traska, urging reversal for amicus curiae Ohio Association of Justice.

Rendigs, Fry, Kiely & Dennis, L.L.P., Jeffrey M. Hines, and Karen A. Carroll, urging reversal for amici curiae Jewish Hospital of Cincinnati and Health Alliance of Greater Cincinnati.

————————————